## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **VICTOR BANDALA-MARTINEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:15-cv-752-GCS** |
| | ) | |
| **CORY FRY,** | ) | |
| **NICHOLAS BEBOUT,** | ) | |
| **FRANK EOVALDI,** | ) | |
| **DAVID DAVIS,** | ) | |
| **RYNE ELLETT,** | ) | |
| **CHRISTOPHER MCCLURE,** | ) | |
| **BILLY CONWAY,** | ) | |
| **REBECCA STEFANI, and** | ) | |
| **CHRISTOPHER BRADLEY,**[1] | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Victor Bandala-Martinez, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges that Defendants Cory Fry, Nicholas Bebout, Frank Eovaldi, Christopher Bradley, Christopher McClure, Ryne Ellett, and Billy Conway used excessive force against him and failed to intervene to protect him from being maliciously and sadistically beaten. He also alleges that all Defendants were deliberately indifferent to his serious medical needs in the wake of the alleged assault. Now before the Court is a motion for summary judgment filed by all Defendants. (Doc. 182). For the reasons delineated below, the Court grants in part and denies in part Defendants' motion.

---

[1]     The Clerk of Court is DIRECTED to correct the names of the defendants to match their names as provided in their answer to Plaintiff's amended complaint (Doc. 74).

## FACTUAL BACKGROUND

At all times relevant to his complaint, Plaintiff Bandala-Martinez was incarcerated at Menard Correctional Center ("Menard"). Defendants Fry, Bebout, Davis, Bradley, Conway, and McClure were correctional officers at Menard. Defendant Eovaldi was a correctional sergeant, and Defendant Ellett was a correctional officer who worked in Internal Affairs. Defendant Stefani was a nurse who worked in the healthcare unit.

On August 14, 2013, Bandala-Martinez was housed in general population at Menard. According to Defendant Fry's testimony at his deposition, around 4:00 p.m. that day the cell doors in Plaintiff's gallery opened so that inmates could walk to chow time. Approximately 25 to 50 inmates typically go to chow together. (Doc. 183-2, p. 7-8). Defendant Eovaldi testified that each inmate must bring his ID badge with him, and all inmates must show their ID to a correctional officer in order to leave the gallery for a meal. (Doc. 183-3, p. 7-8). At this point, the sequence of events put forth by the parties diverge, creating two largely inconsistent versions of the facts at issue.

### 1.   Deposition Testimony of Victor Bandala-Martinez

According to Bandala-Martinez, he left his gallery that afternoon to go to dinner. (Doc. 183-1, p. 25). Defendant Fry stopped him and asked him for his ID, but he was showing his ID to Fry upside down by mistake. (Doc. 183-1, p. 25-26). Bandala-Martinez claims that Fry then insulted him using curse words and called him a "dumb Mexican." (Doc. 183-1, p. 26). Defendants Davis, Eovaldi, and Bebout were there as Fry insulted him, and, after the insults, Bandala-Martinez was assaulted and "taken to the floor" by Fry,

Eovaldi, Bebout, and Davis. (Doc. 183-1, p. 27). Bandala-Martinez claimed that he was assaulted solely because of the exchange of words with Fry. (Doc. 183-1, p. 28).

Once he was on the ground facedown, Defendant Eovaldi allegedly got on top of Bandala-Martinez and put his knee on Plaintiff's neck. Eovaldi began punching Plaintiff in the face. Other officers were twisting Bandala-Martinez's arms and securing a chain around his waist. Plaintiff claims he was punched in the face, in the ribs, and on the back of his head by Eovaldi, Davis, and Bebout. (Doc. 183-1, p. 29). After the assault, Bandala-Martinez was handcuffed and lifted from the floor by the handcuffs. (Doc. 183-1, p. 30). He was dragged to the nearby officer breakroom where he was placed facedown on the floor as the officers continued to punch him and kick him on his back, face, mouth, body, ribs, and rectum. (Doc. 183-1, p. 32). Bandala-Martinez claims he never fought back once the assault began and that it continued for four to five minutes in the breakroom before Lieutenant Bradley arrived. (Doc. 183-1, p. 32).

When Bradley came in, Bandala-Martinez was lifted to his knees, and Bradley began questioning him. (Doc. 183-1, p. 33). When Bandala-Martinez told Bradley that he did not understand the questions, Bradley allegedly began kicking him in his chest, stomach, and neck. Bebout, Davis, and Fry also assaulted Plaintiff until he was dragged from the floor to a nearby holding cell where he was assaulted by Defendants McClure and Conway. (Doc. 183-1, p 34-36). Bandala-Martinez was again taken to the ground and then he described that "[i]t was just raining kicks[,] punches everywhere, all over my body, back, rectum, ribs, back of the head, my entire head." (Doc. 183-1, p. 37).

Bandala-Martinez was lifted from the floor when the assault ended and was taken towards the internal affairs office, but he never made it there. (Doc. 183-1, p. 38-39). Instead, Eovaldi began punching him and lifting him from the floor with force in the middle of the hallway. (Doc. 183-1, p. 39). Bandala-Martinez was returned to the holding cell where Eovaldi's assault continued as Davis held him up. (Doc. 183-1, p. 39-40). When the assault ended minutes later, Bandala-Martinez finally was taken to the internal affairs office. (Doc. 183-1, p. 43).

Officer Ellett spoke with Bandala-Martinez in the internal affairs office. Plaintiff claims he told Ellett that his cuffs were tight and cutting his skin, but Ellett said he would only loosen them if Bandala-Martinez told the truth. (Doc. 183-1, p. 44). According to Bandala-Martinez, Ellett never assaulted him, and Plaintiff testified that he did not believe Ellett saw anyone else assault him. (Doc. 183-1, p. 45). While Bandala-Martinez was talking to Ellett, Defendant Stefani came into the office. She told Plaintiff that he got what he deserved for "hitting stuff." (Doc. 183-1, p. 47). Bandala-Martinez told her about the pain in his wrists as she cleaned blood off his face and left the internal affairs office. (Doc. 183-1, p. 47, 48). After Stefani left, another internal affairs officer came in and began questioning Bandala-Martinez about what happened. (Doc. 183-1, p. 50). Bandala-Martinez testified that he was not assaulted physically any further. (Doc. 183-1, p. 53).

Bandala-Martinez was transferred to Pontiac Correctional Center that night, where he says he was rushed to the healthcare unit. (Doc. 183-1, p. 59). At Pontiac, Plaintiff testified that he had an x-ray of his jaw taken because the doctor thought it was

dislocated. He also testified that the doctor sent him to see a dentist for his jaw. (Doc. 183-1, p. 62-63).

### 2. Deposition Testimony of Inmate Roberto O'Campo

Roberto O'Campo was incarcerated at Menard with Bandala-Martinez on August 14, 2013. He testified that he was moving towards the cafeteria for dinner when Plaintiff got into an altercation with an officer. (Doc. 186-1, p. 3). O'Campo was standing directly behind Bandala-Martinez and saw Plaintiff punch Defendant Fry once in the face. (Doc. 186-1, p. 4-5). After the altercation, O'Campo was pushed down to the ground. He saw Bandala-Martinez get taken down, and once Plaintiff was held down, O'Campo saw officers start to beat Plaintiff. (Doc. 186-1, p. 3).

O'Campo testified that roughly five guards participated in the beating, including a sergeant who put his knee on Bandala-Martinez's back as another guard "started hammer fisting Victor." (Doc. 186-1, p. 3). He estimated that Bandala-Martinez was punched more than ten times while lying on the floor. (Doc. 186-1, p. 4). He saw the guards drag Bandala-Martinez to a side room, but he could not see what happened after that. He saw more officers come to the area, but then O'Campo was locked in his cell. (Doc. 186-1, p. 4).

### 3. Defendants' Deposition Testimony

Defendants, at their depositions, denied using excessive force against Bandala-Martinez. Defendant Fry testified that, as the inmates were walking past him in a single-file line on their way to dinner, he took his eyes off Bandala-Martinez, and when he looked back up, Plaintiff punched him in the face twice. (Doc. 183-2, p. 8). Fry denies

insulting Plaintiff before being punched. (Doc. 183-2, p. 8). Defendants uniformly deny using excessive force and assaulting Bandala-Martinez.   They maintain that they used only the amount of force necessary to subdue him after he punched Fry. (*See, e.g.*, Doc. 183-3, p. 13). Defendant Davis denies being involved in restraining Plaintiff, but he testified that he saw Plaintiff punch Fry and saw Plaintiff get taken to the ground. (Doc. 183-5, p. 7). After Bandala-Martinez was cuffed, Eovaldi testified Davis took Plaintiff off the gallery to the infirmary where he was secured in a holding cell. (Doc. 183-3, p. 13).

Defendant Ellett testified that he did not observe any major injuries when Bandala-Martinez was brought into internal affairs. (Doc. 183-8, p. 8). He denied that Bandala-Martinez complained about his handcuffs being too tight or that he was asked to loosen them. (Doc. 183-8, p. 8). Ellett took a statement from Bandala-Martinez in which Bandala-Martinez allegedly admitted to striking Fry after Fry disrespected him by telling him to "quit crying like a bitch because he wanted toilet paper while he was in segregation." (Doc. 183-8, p. 8).

Defendant Stefani saw Bandala-Martinez after the altercation. Her deposition testimony and medical records reflect that Bandala-Martinez told her that "he hit an officer and then got tangled up and free." (Doc. 183-9, p. 5). Stefani assessed Plaintiff's physical condition, noting a small scratch on his forehead and a small laceration on his right lip. He complained of wrist pain, but he had active range of motion with minimal difficulty while handcuffed. Staff reported to her that Plaintiff was "combative" during cuffing. (Doc. 183-9, p. 5; Doc. 183-10, p. 1).

Defendant McClure testified that he drove Bandala-Martinez to Pontiac Correctional Center the night of the incident. (Doc. 183-6, p. 8). Medical records from Pontiac indicate that Plaintiff had a contusion on his right cheek, a contusion on his forehead, abrasions on his right wrist and forearm, an abrasion on his left wrist, and a puncture wound on his lip. (Doc. 183-10, p. 2). On August 15, 2013, Plaintiff's facial bones and jaw were x-rayed after he complained about difficulty opening his mouth, though no fractures or dislocations were evident. (Doc. 183-10, p. 4, 8).

### 4.   Aftermath of the Incident

In the wake of the August 14, 2013 altercation, Bandala-Martinez was charged with assaulting Defendant Fry by striking Fry multiple times in the face. A disciplinary hearing on the charge was held, and Plaintiff pleaded guilty. He received a year in segregation and a disciplinary transfer. (Doc. 183-11). Bandala-Martinez also was charged with a Class 2 felony for aggravated battery for causing bodily harm to Defendant Fry. He pleaded guilty and was sentenced to an additional three years of incarceration on March 20, 2014. (Doc. 183-12).

Bandala-Martinez filed suit in this Court on July 13, 2015, and he filed an amended complaint on September 8, 2016. In his amended complaint, Bandala-Martinez alleges that Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, Ellett and Conway used excessive force against him on August 14, 2013 (Count I). He further alleges that Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, Ellett and Conway also failed to intervene and protect him from being beaten (Count II). Finally, he alleges that all Defendants acted with deliberate indifference to his serious medical needs by

intentionally and deliberately denying him medical care after the alleged use of force against him. (Count III).

LEGAL STANDARDS

1.  **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

2. **Excessive Force and Failure to Intervene**

The Eighth Amendment's proscription on cruel and unusual punishment extends to prohibit the use of excessive force on prisoners. The use of force is excessive when it involves the unnecessary and wanton infliction of pain. *See Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 667 (7th Cir. 2012). When prison officials are accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Several factors are relevant to this determination, including the need for force, the amount of force applied, the threat a guard reasonably perceived, the effort made to temper the severity of the force used and the extent of the injury caused to the prisoner. *See Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

Even a bystander to the use of excessive force can be held liable under § 1983 for failure to intervene if a plaintiff can show that the officer (1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). A plaintiff must establish an underlying constitutional violation in order to succeed on a claim of failure to intervene. *Id.* (citing *Fillmore v. Page*, 358 F.3d 496, 505-506 (7th Cir. 2004). That is to say, without establishing that at least some guards used excessive force, Plaintiff cannot succeed on his failure to intervene claim.

### 3.  Deliberate Indifference to Serious Medical Needs

The deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" – not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750. *Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015)(citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(noting that violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm")(internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health.

*See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. *See also Hammond*, 123 F. Supp. 3d at 1086 (noting that "isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016))(alterations in original). However, a medical professional's choice of an easier, less

efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441.

## ANALYSIS

### 1. Application of *Heck v. Humphrey*

Defendants first argue that Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a § 1983 action for damages is unavailable if success on the merits necessarily would imply the invalidity of a plaintiff's conviction or sentence, unless that underlying conviction or sentence has been invalidated on direct appeal, expunged by executive order, or declared invalid on habeas review. *Id.* at 486-487. *See also McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019)(stating that "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a § 1983 plaintiff must first "prove that his conviction had been invalidated in some way."). The Supreme Court extended the *Heck* doctrine to civil rights claims arising out of prison disciplinary hearings. *See Burd v. Sessler*, 702 F.3d 429, 434 (7th Cir. 2012)(noting that claims which "necessarily imply the invalidity of the deprivation of . . . [an inmate's] good time credits" are barred by *Heck* until otherwise invalidated)(citing *Edwards v. Balisok*, 520 U.S. 641, 648 (1997), abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020)).

*Heck* prohibits a prisoner in a later civil rights case from challenging a finding that was essential to a decision in his criminal or prison-discipline case. If the prisoner insists on doing so, the civil rights case must be dismissed. *See Moore v. Mahone*, 652 F.3d 722,

723 (7th Cir. 2011)(citing *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003)). *Heck* is analogous to collateral estoppel in that "an issue determined with finality in a full and fair adjudicative proceeding (and essential to the decision in that proceeding) cannot be reopened in a subsequent case." *Id.* In order to determine whether the *Heck* rule applies, the Court must compare the factual basis of a § 1983 claim with the essential facts that supported the disciplinary action. *See Viramontes v. City of Chicago*, 840 F.3d 423, 428 (7th Cir. 2016). If the factual basis of the § 1983 claim and the disciplinary decision are contradictory, the lawsuit must be dismissed without prejudice so long as the disciplinary decision remains in place and valid. *Id*.

Here, Defendants argue that the findings of the Adjustment Committee and of the Circuit Court in which Bandala-Martinez pleaded guilty to a felony aggravated battery require dismissal of this action under *Heck*. Plaintiff, however, argues that he is suing for the use of excessive force, the failure to intervene, and the deliberate difference to his medical needs that occurred after, and in retaliation for, his battery on Fry. According to Plaintiff, the Court can assume for purposes of this motion that he hit Fry in the face, arguing that nothing about the debate about what happened up until the moment when he struck Fry affects his claims about excessive force after the altercation.

The Court first considers the facts underlying Bandala-Martinez's disciplinary decision and his felony conviction. The disciplinary complaint against Bandala-Martinez alleged that:

> I/M Bandala-Martinez struck C/O Fry in the head and face area multiple
> times with closed fists. I/M Bandala-Martinez refused multiple direct
> orders from . . . Sgt. [Eovaldi] to stop assaulting C/O Fry. I/M Bandala-

> Martinez refused several direct orders from . . . Sgt. [Eovaldi] to stop resisting and to cuff up. I/M Bandala-Martinez was extremely combative and aggressive[] towards staff. I/M Bandala-Martinez was restrained with hand cuffs and escorted to the N-H infirmary with no further incident.

(Doc. 183-11, p. 1). Bandala-Martinez pleaded guilty to the disciplinary charge for assaulting Fry after this disciplinary report was read during his hearing.

At his plea and sentencing in the Circuit Court of the Twentieth Judicial Circuit, Randolph County, Illinois, the prosecutor provided the following factual basis for Bandala-Martinez's guilty plea:

> If this matter were to proceed to trial, the State would be prepared to offer evidence that on the 14th day of August, 2013, while within Menard/Chester, Randolph County, Illinois . . . Victor Bandala, B-A-N-D-A-L-A, Martinez, knowingly caused bodily harm to Cory Fry, a correctional officer, knowing Cory Fry to be a correctional institution employee, by striking Mr. Fry in the head and face with his fist, all at the Menard Correctional Center, a penal institution as defined by statute.

(Doc. 183-12, p. 6-7). Plaintiff stipulated to the factual basis when he pleaded guilty.

What is clear from the record is that Bandala-Martinez twice admitted that he struck Fry in the course of proceedings that have not been invalidated. If this case involved issues related to the discipline he received, then it would have to be dismissed pursuant to *Heck*, but this action is more complicated, in that Bandala-Martinez alleges that he was beaten and denied medical care in retaliation for the incident with Fry. In assessing whether his § 1983 claims are barred by *Heck*, the Court looks to the Seventh Circuit cases of *Helman v. Duhaime*, 742 F.3d 760 (7th Cir. 2014) and *Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010).

In *Evans*, police burst into the plaintiff's home, believing he was attempting to strangle someone.  The police arrested the plaintiff after a struggle. Evans was convicted of attempted murder and resisting arrest, and he subsequently filed suit pursuant to § 1983 alleging that the arresting officers used excessive force during and after his arrest. The Seventh Circuit held that Evans could not maintain an action premised on the claim that he did not resist being taken into custody, but he could proceed with claims that the police used excessive force in effecting custody and after he was in custody. *See Evans*, 603 F.3d at 363-364.

The *Helman* Court considered *Evans* in the context of a plaintiff who was convicted of resisting arrest after he was shot by police officers because he attempted to draw a weapon during the execution of an arrest warrant. Helman pleaded guilty to resisting arrest by attempting to draw a deadly weapon, but he filed an excessive force claim against the arresting officers for shooting him. *See Helman*, 742 F.3d at 761-762. The Seventh Circuit found that Helman's "only viable theory of § 1983 liability [wa]s Helman's theory that he did not attempt to draw his weapon until after shots were fired at him." *Id*. at 762-763. The Court determined that such a theory necessarily implied the invalidity of Helman's conviction. Taken together, *Evans* and *Helman* suggest that the timing of and interaction between the offense conduct leading to a conviction and the alleged use of excessive force are important in determining whether a § 1983 action is barred by *Heck*.

Here, Bandala-Martinez's claim is more closely aligned with the plaintiff's claim in *Evans*. Even accepting that Plaintiff admitted striking Fry in two proceedings, that does

not negate the possibility that Defendants, like the officers in *Evans*, could have used excessive force in subduing Bandala-Martinez after he hit Fry or that they could have battered Plaintiff as he describes in his complaint and his deposition testimony after subduing him. His claims of a retaliatory attack and of a lack of needed medical care do not imply the invalidity of his underlying convictions and sentences. As such, Bandala-Martinez's claims are not barred by *Heck*.

2. **Excessive Force and Failure to Intervene Claims against Fry, Davis, Bebout, Eovaldi, Bradley, McClure, and Conway**

Defendants challenge the claim that any force used on Bandala-Martinez was excessive. They argue that Bandala-Martinez punched Defendant Fry, that he was subdued using only the amount of force necessary, and that he was then escorted to the healthcare unit without incident. They do not address the testimony of Bandala-Martinez and O'Campo, which creates disputes of fact that preclude summary judgment. Bandala-Martinez describes being kicked and punched in the gallery before being dragged to a breakroom, and eventually a holding cell, where he was beaten by several of the defendants. O'Campo corroborates Bandala-Martinez's testimony, in part, as he describes watching an officer punch Bandala-Martinez in the face more than ten times as a sergeant kneeled on Plaintiff's back.  He also saw Plaintiff being dragged away. Bandala-Martinez further testified that, after being beaten, he was taken almost all the way to internal affairs before he was dragged back for additional beatings. If the testimony of Plaintiff and O'Campo is credited, a reasonable juror could conclude that

the use of force against Bandala-Martinez moved beyond what was necessary to maintain or restore discipline, precluding the entry of summary judgment.

Defendants Davis, Bradley, McClure, and Conway also argue that they lack personal involvement in the alleged use of excessive force. Defendants' argument rests solely on their own testimony, ignoring Bandala-Martinez's description of the beating he allegedly endured. Bandala-Martinez alleges, among other things, that while he was in the officer breakroom, Defendant Davis punched him as Defendant Eovaldi held him down. Eovaldi also kicked and punched Plaintiff. As to Defendant Bradley, Bandala-Martinez testified that Bradley kicked him in the chest, stomach, and neck in the officer breakroom. Bandala-Martinez also testified that Defendants McClure and Conway attacked him in a nearby holding cell after he was dragged from the breakroom. This testimony is sufficient to establish a level of personal involvement to allow Bandala-Martinez's claim to survive summary judgment.

As disputes of material fact exist as to the length of the alleged attack on Bandala-Martinez and as to the role of each Defendant, summary judgment also cannot be entered on Plaintiff's failure to intervene claim. A reasonable juror assessing the evidence could conclude that Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, and Conway had reason to know that a fellow officer was using excessive force against Bandala-Martinez and that each Defendant had a realistic opportunity to intervene to prevent the act from occurring. Defendants sole argument is that the incident with Bandala-Martinez occurred so fast that they could not have protected him, but that line of argument again ignores Bandala-Martinez's testimony entirely. Based on the record, material disputes of

fact exist such that a trier of fact must decide the outcome of Bandala-Martinez's failure to intervene claim.

### 3. Excessive Force and Failure to Intervene Claims against Defendant Ellett

As to Defendant Ellett, Bandala-Martinez testified that Ellett never assaulted him and that Ellett never saw anyone assault him. The alleged failure by Ellett to loosen Bandala-Martinez's handcuffs alone, which Ellett maintains he was not asked to do, is insufficient to rise to the level of the excessive use of force. Similarly, there is no evidence that Ellett knew of the alleged attack on Bandala-Martinez as it was occurring or that he had a realistic opportunity to intervene. He did not witness any attack and did not meet with Bandala-Martinez until after it was over. As such, no reasonable juror could conclude that Defendant Ellett failed to protect Bandala-Martinez, and Ellett is entitled to summary judgment.

### 4. Deliberate Indifference to Serious Medical Needs

The parties agree that Bandala-Martinez was examined by Defendant Stefani, a nurse, shortly after the August 14, 2013 incident. As non-medical professionals, Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, Ellett, and Conway are entitled to defer to the professional medical judgments of physicians and nurses treating prisoner in their care. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). As there is no evidence that they delayed, interfered with, or prevented Defendant Stefani's examination and treatment of Bandala-Martinez, the Court finds that there is insufficient evidence that the non-medical defendants acted with deliberate indifference to Plaintiff's medical needs. Rather, the

record reflects that medical staff had access to examine Plaintiff without interference from the correctional officers shortly after the altercation ended.

In arguing that Defendant Stefani had the requisite subjective indifference to his medical needs, Plaintiff points to a statement that he testified she made suggesting that he got what he deserved for hitting Fry. He also claims that she did nothing about the pain in his wrists and that she merely wiped blood from his face. The parties do not agree that the medical records accurately reflect Plaintiff's condition and the treatment he received from Stefani, with Plaintiff pointing to documentation of additional and more serious injuries by healthcare staff at Pontiac after his transfer, including abrasions near where his handcuffs were. While there could be innocent explanations, like delays in the appearance of contusions and abrasions, those determinations are best left to a trier of fact. As such, the Court finds that Defendant Stefani is not entitled to summary judgment on Bandala-Martinez's deliberate indifference claim.

### 5. Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the

circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be a "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S. Ct. 348, 350 (2014).

Defendant Ellett is entitled to qualified immunity because, even when the facts are viewed in the light most favorable to Bandala-Martinez, he engaged in no conduct that violated Plaintiff's constitutional rights. For the same reason, Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, and Conway are entitled to qualified immunity on Plaintiff's claim regarding the deliberate indifference to serious medical needs. As to all other claims against these Defendants and as to Bandala-Martinez's deliberate indifference claim against Defendant Stefani, Defendants' conduct could be said to

violate Plaintiff's constitutional rights such that they are not entitled to qualified immunity.

CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. The Court **GRANTS** the motion as to all claims against Defendant Ellett and **FINDS** that he is entitled to qualified immunity on all counts. At the close of the case, the Clerk of Court shall enter judgment in favor of Defendant Ryne Ellett and against Plaintiff Victor Bandala-Martinez on all counts.

The Court further **GRANTS** Defendants' motion as to Plaintiff's deliberate indifference claim in Count III against Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, and Conway and finds that they are entitled to qualified immunity. At the close of the case, judgment shall be entered in favor of these defendants and against Plaintiff Victor Bandala-Martinez on Count III.

The Court **DENIES** Defendants' motion in all other regards, and only the following claims remain pending:

- Count I (Excessive Force) and Count II (Failure to Intervene) against Defendants Fry, Davis, Bebout, Eovaldi, Bradley, McClure, and Conway; and

- Count III (Deliberate Indifference to Medical Needs) against Defendant Stefani.

The Clerk of Court is **DIRECTED** to correct the names of the defendants to match those provided to the Court in Defendants' answer to Plaintiff's amended complaint (Doc. 74).

**IT IS SO ORDERED.**

Dated:  April 20, 2020.

Digitally signed
by Judge Sison
Date:
2020.04.20
11:38:49 -05'00'

_____

GILBERT C. SISON
United States Magistrate Judge